Charles MOZZOCHI, Plaintiff–Appellee,

v.

Richard S. BORDEN, Jr., Paul J. Gibbons, Defendants–Appellants,

Richard S. Borden, Jr., Paul J. Gibbons, Town of Glastonbury, Defendants.

No. 510, Docket 91–7634.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1991.

Decided March 19, 1992.

William S. Rogers, Hartford, Conn. (Susan A. Quinn, Tyler Cooper & Alcorn, of counsel), for appellants.

John R. Williams, New Haven, Conn. (Williams & Wise, of counsel), for appellee.

Before: MESKILL, KEARSE and PIERCE, Circuit Judges.

MESKILL, Circuit Judge:

This case raises the question whether government officials enjoy qualified immunity for causing a criminal prosecution to be brought and maintained against an individual where the prosecution was supported by probable cause but was allegedly motivated by a desire to chill the exercise by the criminal defendant of rights guaranteed by the First Amendment. The United States District Court for the District of Connecticut, Dorsey, *J.*, held that the officials were not entitled to such immunity. Because the district court framed the qualified immunity question too generally, it wrongly concluded that the defendant officials' alleged actions violated clearly established constitutional rights. In doing so, the court erred. We therefore reverse the decision and remand this matter to the district court.

## BACKGROUND

For over a decade prior to the events that form the basis of this action, the plaintiff, Charles J. Mozzochi, had engaged in a letter writing campaign aimed at one of the defendants, Richard S. Borden. Mozzochi, a resident of Glastonbury, Connecticut, was displeased with the manner in which Borden, the Glastonbury Town Manager, was performing his duties. The mailings that Mozzochi sent to Borden and other

Glastonbury officials often contained profane language and expressed Mozzochi's intense personal dislike of Borden.

In December 1986, Mozzochi sent Borden a newspaper clipping that recounted the story of a disgruntled resident who had murdered the mayor of an Iowa city and wounded two members of the city council. Borden, who was aware that Mozzochi had a gun permit and owned a firearm, reported the mailing to the Chief of the Glastonbury Police Department. Borden expressed his concern, which apparently was shared by members of the Town Council, that Mozzochi was dangerous and that the clipping was a serious threat. Officer Paul J. Gibbons of the Glastonbury Police Department investigated the complaint and spoke to Mozzochi. On February 23, 1987, Gibbons obtained a warrant for Mozzochi's arrest.

Mozzochi was arrested and charged with criminal harassment under Conn.Gen.Stat. § 53a–183. That statute proscribes communications made "in a manner likely to cause annoyance or alarm" if made with the intent to harass, annoy or alarm. The basis of the charge was the December 1986 clipping and twenty-three other letters sent to Borden by Mozzochi.

Mozzochi moved to dismiss the complaint on the ground that each of the communications was protected speech under the First Amendment. The state court granted the motion with respect to the twenty-three letters but held that the clipping describing the murder was not protected speech. Mozzochi then moved to suppress the twenty-three letters and the court granted the motion.

Mozzochi's criminal trial was to begin June 30, 1989. On that day, the state prosecutor told Borden that, given the suppression of the twenty-three letters, the case would be very difficult to win and that he was inclined to *nolle prosequi* (nolle) the case. Borden objected, expressing his feeling that Mozzochi had been harassing him and other town officials and noting that he thought Mozzochi would sue him and the town because of the arrest and prosecution. Borden asked the prosecutor

whether it would be possible to obtain a release of civil claims in exchange for the nolle. The prosecutor told Borden that he would propose such an exchange to Mozzochi.

Mozzochi rejected the proposal. The trial of the case began that day. During the proceedings, the state court excluded a photocopy of the newspaper article sent to Borden, further weakening the prosecution. Borden began to testify, but before he could finish the court called a recess until July 6, 1989. On July 3, 1989, Mozzochi filed a motion to dismiss, citing the release-nolle offer by the prosecutor and characterizing that offer as extortion. On July 6, before the trial reconvened, the prosecutor nolled the case.

Mozzochi then brought this action under 42 U.S.C. § 1983 against Borden, Gibbons and the Town of Glastonbury, alleging that the defendants had deprived him of rights secured by the United States Constitution. Specifically, Mozzochi alleged that by causing his arrest and prosecution, the defendants deprived him of the right to free speech, the right of access to the courts and the rights to be free from unreasonable arrest and malicious prosecution. Borden and Gibbons moved for summary judgment on the malicious prosecution and unreasonable arrest claims on the ground that the undisputed facts demonstrated that the prosecution and the arrest were undertaken with probable cause. Borden and Gibbons also moved for summary judgment on the ground of qualified immunity.

Holding that the undisputed facts demonstrated that both the arrest and the prosecution were supported by probable cause, the district court granted the defendants' motion for summary judgment with respect to the unreasonable arrest and malicious prosecution claims. The district court rejected the defendants' summary judgment motion with regard to the free speech and access to the courts claims. The court held that the defendants' motive in initiating and continuing the prosecution was a critical factor in those claims and that there was evidence from which a jury could find that the prosecution was initiated to deter

Mozzochi's protected speech and was later maintained solely for the purpose of barring Mozzochi from court. Applying the qualified immunity test set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the district court held that at the time of the arrest and prosecution (1) "a citizen possessed a clearly established constitutional right not to have his speech regulated because the state actor disagreed with its content;" and (2) "an accused possessed a clearly established right to access the courts to redress constitutional violations." Because it held that the defendants' motive and conduct, if proven, violated clearly established rights, the district court rejected the defendants' summary judgment motion based on qualified immunity. The district court did not address defendants' argument that Mozzochi had not suffered any constitutional deprivation.

## DISCUSSION

■ Although neither party questions our jurisdiction over this interlocutory appeal, as a preliminary matter we must nonetheless address that issue. *Natale v. Town of Ridgefield*, 927 F.2d 101, 104 (2d Cir.1991). 28 U.S.C. § 1291 provides jurisdiction in the courts of appeals over "final decisions" of the district courts. The denial of a motion for summary judgment is generally not such a "final decision." However, to the extent that it turns on a question of law, a district court's denial of summary judgment on an official's claim of qualified immunity is an appealable "final decision" within the meaning of section 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). The district court's denial of the defendants' motion for summary judgment based on qualified immunity, to the extent that it assumed that the rights allegedly violated were constitutionally protected, turned on a question of law and thus appellate jurisdiction is appropriate.

Public officials are entitled to qualified immunity from liability for civil damages arising out of discretionary functions. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

As long as their conduct does not violate a clearly established statutory or constitutional right, they cannot be held liable. *Id.* The standard for determining whether an official is entitled to immunity is essentially objective, designed to avoid the "costs of trial" and the "broad-reaching discovery" associated with attempts to prove an individual official's subjective state of mind. *Id.* at 817–18, 102 S.Ct. at 2737–38.

When addressing a claim of qualified immunity, a court must take care not to pose the issue in terms that are too general or abstract. As the Supreme Court warned in *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987):

> The operation of [the qualified immunity] standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

One of the goals of qualified immunity is to eliminate meritless actions against pub-

lic officials at the earliest possible stage in the litigation. *See Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *Harlow,* 457 U.S. at 816–18, 102 S.Ct. at 2737–38. Therefore, where qualified immunity is raised on a motion for summary judgment, the court ought to consider the immunity claim in light of all the facts about which there is no genuine dispute. *See* Fed.R.Civ.P. 56(c).

Therefore, when undertaking a qualified immunity analysis on a motion for summary judgment, a court should ask whether, viewing the evidence in the light most favorable to the non-moving party, the conduct that may be proved at trial is conduct that, at the time it occurred, violated a clearly established constitutional or statutory right. If the answer is no, the court should grant a defendant's motion for summary judgment. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 ("Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on *summary judgment.*") (emphasis added) (footnote omitted). With these principles in mind, we turn to the two claims of qualified immunity that were denied by the district court.

### A. *The Free Speech Claim*

The district court denied the defendants' motion for summary judgment based on qualified immunity with regard to Mozzochi's claim that he was deprived of the right to speak freely. The district court framed the qualified immunity question on this issue as whether "a citizen possessed a clearly established constitutional right not to have his speech regulated because the state actor disagreed with its content." Posed in that manner, the question answers itself. Content based regulation of speech is clearly prohibited by the First Amendment. *See, e.g., Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas,

its subject matter, or its content.") (citation omitted).

The district court's statement of the issue, however, was more general than is appropriate in a qualified immunity inquiry. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39. The district court addressed Mozzochi's free speech claim in the abstract manner that the Supreme Court cautioned against in *Anderson.* Our first task, therefore, is to focus the inquiry to the appropriate "level of generality" utilizing the proper summary judgment standard.

 In this case, the district judge determined that the mailing of the article describing the Iowa slaying provided probable cause for both the arrest and the prosecution. After reviewing the record, we agree. The article can plainly be interpreted as a threatening communication and as such is beyond the protection of the First Amendment. *See United States v. Shoulberg,* 895 F.2d 882, 886 (2d Cir.1990). That communication therefore could properly form the basis for a criminal prosecution under Conn.Gen.Stat. § 53a–183, and it would have supported a finding that Mozzochi had violated that statute. A criminal prosecution solely in response to a threatening communication does not violate the First Amendment.

However, Mozzochi had been a vocal critic of Borden and the town government for years. The vast majority of his communications in that time, although crude, were fully protected by the First Amendment. The district judge determined that there was evidence from which the jury could conclude that the prosecution was initiated "to deter, if not silence, plaintiff's criticisms of [Borden] and the manner in which he managed the Town." However, the record reveals that there was no genuine dispute as to whether the prosecution actually had the effect of silencing Mozzochi. Borden submitted an affidavit stating that Mozzochi's letters criticizing his performance continued unabated throughout the litigation. Mozzochi did not counter this assertion with any evidence to support his allegation that he was actually chilled in

the exercise of the right to free speech. "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations ... of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). For purposes of this inquiry, therefore, it is established that the prosecution did not have the effect of inhibiting Mozzochi's exercise of his right to speak freely.

■ Framed at the proper level of generality and incorporating the facts about which there was no genuine dispute, the qualified immunity question is whether, at the time the alleged acts took place, it was clearly established that an individual's constitutional rights were violated when a criminal prosecution, supported by probable cause, was initiated in an attempt to deter or silence the exercise by the criminal defendant of his right to free speech, but without the effect of actually deterring or silencing the individual. It is to this question that we now turn.

The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was "clearly established" at the time the conduct occurred. *See Siegert v. Gilley,* — U.S. —, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by the plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). It has long been established that certain adverse governmental action taken in retaliation against the exercise of free speech violates the First Amendment. *See, e.g., Mt. Healthy School Dist. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 573–74, 50 L.Ed.2d 471 (1977) (non-tenured teacher may "establish a claim to reinstatement if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms") (ci-

tation omitted). The question is whether a claim for retaliation can be sustained when the criminal prosecution was supported by probable cause.

We recently addressed a contention similar to the one raised in this case. In *Magnotti v. Kuntz,* 918 F.2d 364 (2d Cir. 1990), the plaintiff had made a complaint to the Internal Affairs Division of the New Haven Police Department, alleging that an officer of that department had used excessive force against the plaintiff. A sergeant in the Internal Affairs Division investigated the complaint and found it to be without merit. The sergeant also determined that the plaintiff had made false statements in violation of state law and therefore the sergeant sought an arrest warrant. The prosecution was eventually dismissed for reasons unrelated to the merits of the case.

The plaintiff brought an action against the sergeant under section 1983, alleging that the prosecution was brought in retaliation for the complaint lodged against the police officers. The defendant moved for summary judgment on the basis of qualified immunity, and the magistrate to whom the case was assigned held that, although there was probable cause for the prosecution, "in light of the First Amendment nature of the claim, an inquiry into [the sergeant's] intent was required.... Since [the plaintiff] presented a claim of retaliatory prosecution, more than mere probable cause was required for a dismissal of the complaint." *Magnotti,* 918 F.2d at 366.

■ On appeal, we recognized that "retaliatory prosecution may expose a state official to section 1983 damages." *Id.* at 368 (citation omitted). However, we refused to examine the motivation behind the decision by the sergeant to seek an arrest warrant. Without examining the motive, we held that, because there were reasonable grounds for the defendant to believe that probable cause existed, the defendant was entitled to qualified immunity. *Id.* Similarly, because there was probable cause in this case to believe that Mozzochi violated the harassment statute, we will not examine the defendants' motives in re-

porting Mozzochi's actions to the police for prosecution.

*Musso v. Hourigan,* 836 F.2d 736 (2d Cir.1988), relied upon by both the district court and Mozzochi on this appeal, is not to the contrary. In that case, Musso was arrested for disorderly conduct and interfering with a police officer. Musso had been ruled out of order by the chair of the school board. The only thing that made Musso's conduct arguably criminal was his failure to comply with the order of the chair. If that order was based upon an impermissible criterion—the content of Musso's speech—it violated the First Amendment. Therefore, if the order had been improperly motivated there would have been no probable cause to arrest him. By contrast, in both this case and in *Magnotti* probable cause to arrest existed independent of the defendants' motive. Thus, the defendants' motive need not be examined.

Several courts have held that the success of an attempt to deprive an individual of constitutional rights is critical to whether those rights have in fact been violated. *See Sullivan v. Carrick,* 888 F.2d 1, 4 (1st Cir.1989) ("To show a First Amendment violation in this context [plaintiff] must allege that his speech was in fact chilled or intimidated."); *Dooley v. Reiss,* 736 F.2d 1392, 1394–95 (9th Cir.) (where government officials conspired unsuccessfully to prevent plaintiff from exercising First Amendment right, no redressable constitutional violation because of the absence of an actual constitutional deprivation), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *see also Spear v. Town of West Hartford,* 954 F.2d 63, 67 (2d Cir.1992) (editor who alleged that RICO lawsuit by town chilled his First Amendment right to free speech did not state claim under section 1983 because he failed to allege chilling effect with sufficient particularity). An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause that is in reality an unsuccessful attempt to deter or silence criticism of the government. Therefore, the defendants should have been granted summary judg-ment on the issue of qualified immunity with respect to Mozzochi's claim that he was deprived of his right to free speech.

### B. *Access to the Courts*

■ In examining the defendants' claim of qualified immunity with respect to Mozzochi's claim that he was denied access to the courts, the district court determined that at the time of the alleged proposal to exchange a nolle of the criminal action for a release from civil liability "an accused possessed a clearly established right to access the courts to redress constitutional violations." Once again the district court ignored the warning in *Anderson* against framing the qualified immunity question in overly broad terms. The First Amendment right to "petition the government for a redress of grievances" means that an individual has a right to access the courts to redress a constitutional violation. *See, e.g., California Transport v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972); *NAACP v. Button,* 371 U.S. 415, 429–30, 83 S.Ct. 328, 335–36, 9 L.Ed.2d 405 (1963). However, the question here must be more narrowly drawn. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. at 3038–39.

As noted in the discussion of the free speech claim, the district court found that there was no genuine dispute as to whether the prosecution was supported by probable cause. We agree, and note that the ruling that eventually led to the abandonment of the prosecution was not one that necessarily negated the existence of probable cause. First, the court rejected the proffer of the threatening newspaper article because the state offered only a photocopy of what Mozzochi had sent; the court ruled that this failed to satisfy the "best evidence" rule. Such a ruling does not prevent the offering party from introducing the original document. Further, the court's ruling was "without prejudice." Thus, if the state could not find the original, it was free to try to persuade the court to allow the copy to be introduced. In any event, the state was not required to dismiss the case instantaneously after an adverse evidentia-

ry ruling, and we see nothing in the five day interval between the evidentiary ruling and the *nolle prosequi* that could rationally be considered a denial of Mozzochi's access to the courts.

Here, as with the free speech claim, Mozzochi was not actually prevented from exercising the constitutional right at issue. In his complaint, Mozzochi does not even allege that he was ever actually deprived of his right to access the courts. On appeal the most that he claims is a six day delay in bringing his suit. It is undisputed that he never signed the requested release. Therefore, the relevant qualified immunity inquiry is whether an individual has a constitutional right to be free from a prosecution supported by probable cause but maintained because the individual will not release a potential claim of civil damages arising out of that prosecution, and if so whether that right was clearly established in July 1989.

The Supreme Court has recognized that "release-dismissal agreements may further legitimate prosecutorial and public interests." *Town of Newton v. Rumery*, 480 U.S. 386, 397, 107 S.Ct. 1187, 1194, 94 L.Ed.2d 405 (1987). If we were to hold that the Constitution prohibited the continuation of a criminal prosecution supported by probable cause because the criminal defendant did not agree to execute a release of civil liability for claims arising from that prosecution, then such agreements would be virtually eliminated. Any time a prosecutor proposed such an exchange, the criminal defendant could reject the proposal and claim that any continuation of the prosecution violated the Constitution. Although the prosecutor would be absolutely immune from a civil suit, the criminal defendant might be able to seek injunctive relief in federal court. *See Schloss v. Bouse*, 876 F.2d 287, 289–92 (2d Cir.1989). Such a situation would severely restrict the use of release-dismissal agreements and further increase litigation, both criminal and civil.

Where a criminal prosecution remains supported by probable cause, the Constitution does not necessarily prohibit the prosecutor from seeking a release-dismissal agreement with the criminal defendant. *See Town of Newton*, 480 U.S. at 396–97, 107 S.Ct. at 1193–94. Therefore, Mozzochi was not deprived of his right of access to the courts by the continuation of the prosecution after he rejected the release-dismissal exchange. Had the probable cause for the prosecution disappeared at some point, the maintenance of the prosecution for purposes of obtaining a release might well violate the Constitution. We need not decide whether a prosecution supported by probable cause brought or maintained in order to exact a release of liability for actions not directly related to the prosecution of that case would constitute a constitutional deprivation. Neither of these situations is present here. The defendants, therefore, are entitled to summary judgment on the basis of qualified immunity with regard to Mozzochi's claim that he was denied access to the courts.

## CONCLUSION

Because the alleged conduct did not deprive Mozzochi of any constitutional right, the defendants in this case are entitled to summary judgment on the basis of qualified immunity. The case is remanded to the district court for further proceedings not inconsistent with this opinion.