J. Blaine LEWIS, Plaintiff–Appellee,

v.

Bruce D. COWEN, Roland H. Lange, and William V. Hickey, Individually, Defendants–Appellants.

No. 97–7895.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1998.

Decided Jan. 15, 1999.

Aaron S. Bayer, Assistant Attorney General (Robert F. Vacchelli, on the brief), Richard Blumenthal, Attorney General, Hartford, Connecticut, for Defendants–Appellants.

William S. Rogers, Tyler, Cooper & Alcorn (William H. Champlin III, on the brief), Hartford, Connecticut, for Plaintiff–Appellee.

Before: KEARSE and WALKER, Circuit Judges, and WEINSTEIN, District Judge.[*]

WALKER, Circuit Judge:

Plaintiff-appellee J. Blaine Lewis, the person in charge of Connecticut's lottery, was fired by his supervisors for refusing to publicly support a change in the lottery. Claiming a deprivation of his First Amendment rights, he won a substantial jury verdict in the United States District Court for the District of Connecticut (Alfred V. Covello, *Chief District Judge*). The defendants-appellants, all Connecticut state public officials, now appeal from several district court judgments that: (1) ordered defendant-appellant William V. Hickey to pay Lewis compensatory and punitive damages for wrongfully terminating his public employment in violation of the First Amendment; (2) ordered all the defendants-appellants to pay compensatory damages for wrongful termination under state law; and (3) awarded attorney's fees to Lewis. On appeal, the defendants-appellants respond primarily that they were entitled to terminate Lewis pursuant to the standard announced in cases such as *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20

[*] The Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation.

L.Ed.2d 811 (1968), and in the alternative, that their decision to terminate Lewis is shielded by qualified immunity.

■ It is by now well established that public employees do not check all of their First Amendment rights at the door upon accepting public employment. *See, e.g., United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995). Frequently, courts must decide whether a public employer acted properly in disciplining an employee *for* speaking out on some matter. Here, however, the question is presented with a slight twist: when may a public employer discipline an employee for refusing to speak? In the present case, we conclude that the termination was justified, and that in any event it was error for the district court to deny the defendants' motion for judgment as a matter of law on the ground of qualified immunity. We also hold that, as a matter of state law, the defendants are immune from liability on Lewis's state law wrongful discharge claim. We therefore reverse the district court's judgments on the First Amendment and state law claims. Finally, because Lewis is no longer a "prevailing party," within the meaning of 42 U.S.C. § 1988, we reverse the district court's award of attorney's fees.

## BACKGROUND

On May 23, 1980, Lewis was appointed Chief of the Lottery Unit of the Connecticut Division of Special Revenue ("the Division") by the Division's then-Executive Director. His appointment was approved by the Gaming Policy Board ("the Board"), a five-member body appointed by the governor of Connecticut and confirmed by the legislature, that oversees all Division operations. *See* Conn. Gen.Stat. §§ 12–557c–e.[1] Lewis was an unclassified employee and therefore served at the pleasure of the Executive Director and the Board. *See* Conn. Gen.Stat. § 12–559.[2]

Through its seven units, the Division administers legalized gaming activities in the state. The Lottery Unit administers the Connecticut State Lottery. As Lottery Unit Chief, Lewis managed over thirty employees and reported directly to the Division's Executive Director. Lewis was responsible for designing lottery games and for maintaining the security of and public confidence in the Lottery. Part of his job was to communicate with the media and the public as, in his own words, "the official lottery spokesman."

Lewis also enjoyed national prominence in the public gaming community. He served as Secretary, Vice President, and President of the National Association of State and Provincial Lotteries, an association of public gaming executives in the United States and Canada, and published several articles in *Public Gaming International,* a trade magazine on whose cover he had been featured. Every year that Lewis ran the Unit, lottery sales increased and in his nine years as Lottery Chief, sales quadrupled.

In 1988 and 1989, a series of events eventually led to Lewis's termination. Over the objections of Lewis and other officials, in early 1988 the State Department of Administrative Services, with the approval of the Board, awarded General Instrument Corporation ("GIC") the contract to install an online computer system for the sale of lottery tickets at terminals located throughout the state. GIC's on-line system malfunctioned,

1. Section 12–557c provides:

 (a) There shall be a division of special revenue within the department of revenue services.... The division of special revenue shall, in cooperation with the Gaming Policy Board, implement and administer the provisions of this chapter....

 Section 12–557d provides:
 (a) There shall be a Gaming Policy Board.... Said board shall consist of five members appointed by the governor with the advice and consent of ... the general assembly.

 Section 12–557e provides:

 [T]he board shall be responsible for: (1) Approving, suspending or revoking licenses ... (2) approving contracts ... (4) imposing fines on licensees ... (7) assisting the executive director in developing regulations to carry out the provisions of this chapter ... and approving such regulations prior to their adoption....

2. Section 12–559 provides:
 [T]he executive director shall, with the advice and consent of the board, appoint unit heads ... who shall be exempt from classified service.

resulting in a system-wide breakdown of on-line sales and the imposition of a substantial fine on GIC. Lewis criticized GIC to the press. Because Lewis's superiors believed that this public criticism generated negative publicity for the Lottery, they directed all Unit heads to refrain from speaking with the media and hired a full-time public information officer. The directive was eventually withdrawn, although the Division's public information officer remained.

By December 1988, GIC had suggested to the Board that sales of the Lotto game would increase if winners were required to correctly choose 6 of 44 numbers rather than 6 of 40 numbers. In this way, the odds of winning would be significantly reduced, but the jackpot probably would be greater. Lewis opposed the change. He believed that revenues would decrease and suspected that GIC had recommended the change merely to cover up problems with on-line ticketing. Lewis made his concerns clear to the Board at meetings and in written memoranda throughout the spring of 1989.

By early May 1989, defendant Hickey, now the Executive Director of the Division, had decided to propose to the Board that the Lotto game's field of numbers be changed from 40 to 44. Before May 15, Hickey met with Lewis and then-Division Deputy Director William T. Drakeley to discuss the change. Lewis persisted in his objections.

Despite Lewis's unwavering opposition, at a May 15 meeting, Hickey directed Lewis to serve as project manager for the change and, according to Lewis, told him to present the change to the Board "in a positive way." Lewis understood this instruction to be an order "to lie to [the Board] because [Hickey] knew" of Lewis's opposition to the change. Lewis believed that Hickey wanted him to present "all positives and no negatives," and thereby promote the change to the Board without presenting the risks involved. Because Board meetings were open to the public, this also would result in the public not learning of Lewis's negative opinion of the change.

On May 16, 1989, at Lewis's request, Hickey reiterated his order in writing. The written order indicated that the Division would be changing the Lotto game subject to "ultimate approval" by the Board. The memorandum continued "I am ordering you to assume the role of Project Manager for this transition" and concluded "I expect all your efforts will be expended toward a successful Lotto game transition." Although the letter did not explicitly require Lewis to present the change to the Board in a positive manner, Lewis testified that Hickey repeated this order verbally. Lewis's written response expressed his opposition to changing Lotto, and asked Hickey to rescind his order. Lewis also criticized the timing of the change because there were three vacancies on the Board. The reduced Board consisted of Hickey and defendants Cowen and Lange.

Hickey testified that prior to May 18, he simply asked Lewis to keep the matter confidential until Lewis made his decision as to whether he would follow Hickey's order. According to Hickey, Lewis refused to remain silent and Hickey let the matter drop. At a May 18 meeting, Hickey reiterated his order that Lewis serve as the project manager for the Lotto change. At trial, Hickey conceded that at this meeting he ordered Lewis "to present [the change] to the Gaming Policy Board and go forward in a positive fashion," but insisted that he did not order Lewis to lie. Lewis refused to comply, and told Hickey that his order "put him in a box" and "ma[de him] into a prostitute." Lewis testified that at the same meeting, Hickey ordered him not to publicly discuss his opposition to the change. According to Hickey, Lewis stated at the May 18 meeting that Lewis "was playing hard ball" and that he had discussed the matter with "all of his friends and colleagues." Because Lewis refused to follow Hickey's order, Hickey relieved Lewis of his duties as Chief of the Lottery Unit and placed him on a paid leave of absence.

On May 22, Hickey notified Lewis that a pre-disciplinary hearing had been scheduled for May 24. At the May 24 hearing, Lewis stated that he would "obey all lawful orders" and that he would "design a new game and present it in a balanced manner before a duly constituted Board." After the hearing, Hickey decided to recommend that the Board

terminate Lewis. On May 25, the Board unanimously approved the change in the Lotto game; but because Lewis failed to attend the meeting, the Board postponed consideration of his termination. The following day, the Board voted to terminate Lewis, and on June 1, Lewis received notice of his termination, effective as of May 26. Lewis appealed his termination to the Connecticut Superior Court claiming a violation of Connecticut's Uniform Administrative Procedure Act ("UAPA"), Conn. Gen.Stat. § 4–183(a). That court dismissed his appeal, and the Connecticut Supreme Court affirmed, holding that Lewis had no right to appeal his dismissal under the UAPA. *See Lewis v. Connecticut Gaming Policy Bd.*, 224 Conn. 693, 699–711, 620 A.2d 780 (1993).

On May 22, 1991, Lewis filed this 42 U.S.C. § 1983 action in the district court. His amended complaint alleges, *inter alia*, that his termination violated the First and Fourteenth Amendments to the United States Constitution; Article First, Section Eight of the Connecticut Constitution; and Conn. Gen.Stat. § 31–51q.[3] It further alleges a Connecticut common law claim of wrongful termination in violation of an important public policy and demands compensatory and punitive damages as well as attorney's fees and costs. The district court granted the defendants' motion to dismiss Lewis's § 31–51q and federal due process claims, but denied the defendants' motion for summary judgment on Lewis's free speech claim, ruling that as a matter of law the defendants were not entitled to qualified immunity and that genuine issues of material fact existed regarding liability. At a trial before Magistrate Judge Thomas P. Smith on the First Amendment and wrongful discharge claims, the Magistrate Judge, relying on Judge Covello's summary judgment ruling, precluded the defendants from asserting qualified immunity.

The jury returned a verdict in favor of Lewis. On the § 1983 claim, the jury found that Hickey, but not Lange or Cowen, violated Lewis's First Amendment rights. On the state law claim, the jury found that Hickey, Cowen and Lange all wrongfully terminated Lewis in violation of an important public policy.

On June 17, 1997, Magistrate Judge Smith awarded Lewis $351,681.60 in attorney's fees pursuant to 42 U.S.C. § 1988, and denied Lewis's request for punitive damages on the state law count on the basis that, under Connecticut law, punitive damages are designed to compensate plaintiffs for the costs of litigation and that the § 1988 fees award sufficiently compensated Lewis. In a separate order, the Magistrate Judge denied the defendants' motions for a new trial and/or remittitur, and for judgment as a matter of law. The district court entered judgment awarding Lewis a total of $2,048,853.20 ($1,028,196 in compensatory damages, $640,-644 in punitive damages, and $380,013.20 in attorney's fees).

## DISCUSSION

On appeal, the defendants argue that they are entitled to judgment on both the federal and state counts as a matter of law because (1) Lewis's refusal to obey Hickey's order was not protected by the First Amendment; (2) the defendants are entitled to qualified immunity for their actions; (3) the defendants are immune from liability for wrongful discharge under state law pursuant to Conn. Gen.Stat. § 4–165; and (4) no cause of action for wrongful discharge in violation of public policy lies against the defendants in their individual capacities. They further argue that the magistrate judge abused his discretion (5) by excluding evidence of the Attorney General's opinion on the legality of Board action; and (6) by failing to order a new trial or remittitur on the basis that the

---

**3.** Section 31–51q provides:

Any employer, including the state and any instrumentality ... thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or ... article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and employer, shall be liable to such employee for damages ... including punitive damages, and for reasonable attorney's fees....

damages awards were excessive and not supported by the evidence. Finally, the defendants claim that the magistrate judge erred (7) in refusing to instruct the jury on Lewis's duty to mitigate damages and to disregard lay opinions on the causes of medical conditions from which Lewis suffered after his termination and (8) in refusing to reduce the attorney's fees awarded to Lewis. Because we agree with the defendants' first three arguments, we reverse the judgments of the district court. We have no need to address the remaining claims.

## I. *First Amendment*

 Public employees may not be compelled to abandon all of their constitutional rights as a prerequisite to obtaining or continuing their employment. "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (internal quotation marks omitted). Among the rights retained by public employees is that of freedom of expression as guaranteed by the First Amendment to the Constitution. *See id.; United States v. National Treasury Employees Union ("NTEU")*, 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The First Amendment protects the right to refrain from speaking just as surely as it protects the right to speak. *See Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

 The determination whether a public employer has violated the First Amendment by firing a public employee "for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731); *see also NTEU*, 513 U.S. at 465–66, 115 S.Ct. 1003; *Mt.˙ Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This weighing, commonly referred to as the *Pickering* balancing test, is necessitated by the State's dual role as employer and sovereign. As sovereign, a State's ability to regulate speech is severely limited by the First Amendment, which protects the free and open discourse concerning public affairs that "is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Yet, as an employer charged with providing such essential services as public safety and education, the Constitution provides a State with greater leeway to control employees' speech that threatens to undermine its ability to perform its legitimate functions. *See NTEU*, 513 U.S. at 475 n. 21, 115 S.Ct. 1003; *Waters v. Churchill*, 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion). However, courts must ensure that governments do not use their status as employers as a subterfuge to undermine free speech. As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin*, 483 U.S. at 384, 107 S.Ct. 2891.

 In determining whether employee speech is protected by the First Amendment, a court first must decide whether the speech addresses a matter of public concern. *See id.; NTEU*, 513 U.S. at 466, 115 S.Ct. 1003. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude ... without intrusive oversight by the judiciary...." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684; *see also Waters*, 511 U.S. at

674, 114 S.Ct. 1878 (plurality opinion); *Blum v. Schlegel,* 18 F.3d 1005, 1012 (2d Cir.1994); *Piesco v. City of New York,* 933 F.2d 1149, 1155 (2d Cir.1991) (*"Piesco I "*).

Second, if the speech addresses a matter of public concern, a court then balances the interests of the employer in providing "effective and efficient" public services, *see Connick,* 461 U.S. at 150, 103 S.Ct. 1684; *see also Waters,* 511 U.S. at 675, 114 S.Ct. 1878 (plurality opinion), against the employee's First Amendment right to free expression, *see Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *Piesco I,* 933 F.2d at 1155. In balancing these interests, a court must consider whether the statement sought to be protected "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891; *see also Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684. The government bears the burden of demonstrating that the speech threatens to interfere with government operations. *See NTEU,* 513 U.S. at 466, 115 S.Ct. 1003; *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995); *see also Rankin,* 483 U.S. at 388, 107 S.Ct. 2891.

The "manner, time, and place" in which the speech occurs is important in determining whether it is protected. *See Connick,* 461 U.S. at 152, 103 S.Ct. 1684. For example, the *Pickering* balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers. *See Connick,* 461 U.S. at 152–53 & n. 13, 103 S.Ct. 1684; *Rankin,* 483 U.S. at 393, 107 S.Ct. 2891 (Powell, J., concurring) ("The risk that a single, offhand comment directed to only one other worker will lower morale, disrupt the work force, or otherwise undermine the mission of the office borders on the fanciful.").

The weight afforded each side of the *Pickering* balance also varies with the content of the speech. The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown. *See Connick,* 461 U.S. at 152, 103 S.Ct. 1684; *Jeffries,* 52 F.3d at 13; *Frank v. Relin,* 1 F.3d 1317, 1329 (2d Cir.1993). Furthermore, the *Pickering* balance is affected by the nature of the disciplined employee's responsibilities. "[T]he more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy v. Spencer,* 124 F.3d 92, 103 (2d Cir.1997)(internal quotation marks omitted). *See also Rankin,* 483 U.S. at 390–91, 107 S.Ct. 2891. "[T]he policymaking status of the discharged or demoted employee is very significant in the *Pickering* balance, but not conclusive." *McEvoy,* 124 F.3d at 103. As the *Pickering* Court itself noted, "[i]t is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal." 391 U.S. at 570 n. 3, 88 S.Ct. 1731.

Judge Weinstein suggests in his concurrence that a *Pickering* analysis is not necessary whenever a policymaking employee is discharged. This misapprehends the exception to First Amendment protection available to a discharged employee that the Supreme Court has carved out in cases such as *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), for discharges based on political affiliation. Although it is true that, consistent with the First Amendment, a policymaking employee may be discharged on the basis of political affiliation such as membership (or lack of membership) in a particular political party, that same employee may not be discharged on the basis of specific speech on matters of public concern unless the *Pickering* balancing test favors the government employer. Where the discharge is based on discrete incidents of speech rather than political affiliation, *Pickering,* not *Branti* and *Elrod,* provides the appropriate framework of analysis. To the extent that the

Ninth Circuit's decision in *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1332–34 (9th Cir.1997), relied upon in the concurring opinion, supports a contrary view, we have rejected that view. *See McEvoy v. Spencer*, 124 F.3d 92, 101 (2d Cir.1997) ("Where the evidence shows that the employer discharged a policymaker solely for speaking out on matters of public concern, and that the policymaker's political beliefs played no role in the employer's decision, *Elrod* is inapplicable and *Pickering* must be applied....").

 The Supreme Court also has explained that regardless of the content of the speech, the responsibilities of the employee, or the context in which the speech was made, an employer is never required "to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick*, 461 U.S. at 152, 103 S.Ct. 1684; *see also Khuans v. School Dist. 110*, 123 F.3d 1010, 1014 (7th Cir.1997); *Rendish v. City of Tacoma*, 123 F.3d 1216, 1225 (9th Cir.1997), *cert. denied*, ─ U.S. ──, 118 S.Ct. 2368, 141 L.Ed.2d 737 (1998). The State need show only a *"likely* interference" with its operations, and "not an *actual* disruption." *Jeffries*, 52 F.3d at 13; *see also Waters*, 511 U.S. at 673, 114 S.Ct. 1878 (plurality opinion) (Court gives "substantial weight to government employers' reasonable predictions of disruption" caused by employee speech); *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998) ("government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities" in a manner outweighing employee's interests). *But see Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (faulting public employers for failing to identify "actual disruption"); *Melton v. City of Oklahoma City*, 879 F.2d 706, 715–16 (10th Cir.1989) ("government must introduce evidence of an actual disruption of its services resulting from the speech at issue"). However, even if the *Pickering* balance is resolved in the employer's favor, the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption. *See Sheppard v. Beerman*, 94 F.3d 823, 827 (2d Cir.1996).

 Finally, if the employee succeeds in demonstrating that his speech is constitutionally protected under *Pickering*, he must then prove that the speech was a substantial or motivating factor in the adverse employment action. If the employee meets that burden, the employer is given an opportunity to establish by a preponderance of the evidence that it would have taken the same action even in the absence of the protected speech. *See Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568; *Heil*, 147 F.3d at 110; *Frank*, 1 F.3d at 1329.

In the present action, there is no dispute that Lewis's speech, or more precisely, his refusal to speak to the Board in the manner directed by Hickey, was a substantial or motivating factor in the decision to terminate Lewis. Nor do the defendants press on appeal the argument that they would have terminated Lewis even had he not refused to follow Hickey's order. Lewis has not presented evidence that the defendants acted out of an improper desire to retaliate against Lewis, rather than out of fear that Lewis's actions would undermine their ability to effectively operate the division. So we are left with two questions: (1) did Lewis's refusal to speak to the Board touch on a matter of public concern?; and (2) did the potential disruptiveness of Lewis's refusal to speak outweigh his First Amendment-based interest in not speaking?

A. Speech on Matter of Public Concern

 Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record. *See Connick*, 461 U.S. at 147–148 and n. 7, 103 S.Ct. 1684; *Luck v. Mazzone*, 52 F.3d 475, 476 (2d Cir.1995) (per curiam); *Piesco v. Koch*, 12 F.3d 332, 342 (2d Cir.1993) ("*Piesco II* "). In reaching this decision, the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public

purpose. *See Curtis*, 147 F.3d at 1212. As the district court found and defendants concede on appeal, we easily hold that Lewis's speech addressed a matter of public concern.

The Division's 1988–89 Annual Report indicated lottery sales of $494,524,000 for the fiscal year, with $219,650,000 in "profits" for the state. By itself, the Lotto game was responsible for $236,011,000 of those sales and $105,400,000 of the year's profits. Courts have frequently found that the public fisc is a matter of public concern. *See, e.g., Roth v. Veteran's Admin.*, 856 F.2d 1401, 1405–06 (9th Cir.1988) (collecting cases). Lewis did not allege corruption or public wrongdoing, unlike the typical *Pickering* case. *See id.; Piesco I*, 933 F.2d at 1157. We nevertheless conclude that Lewis's speech was motivated by a desire to maintain the Lotto game's viability and to enhance public revenue. This plainly implicates a matter of public concern. *See Connick*, 461 U.S. at 147, 103 S.Ct. 1684.

■ Admittedly, speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern. *See id.* Because Hickey ordered Lewis to serve as project manager and to present the change in the Lotto game to the Board, Lewis's refusal to do so in a positive manner arguably concerned a matter of some personal interest to him. However, this circumstance does not affect our conclusion that the matter was also one of public concern. *Connick* precludes First Amendment protection for public employees when they speak "upon matters *only* of personal interest." *Id.* (emphasis added).

### B. The *Pickering* Balancing Test

■ As a preliminary matter, the magistrate judge erred when he submitted the *Pickering* balancing test to the jury to resolve. "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684; *see also Rankin*, 483 U.S. at 386 n. 9, 107 S.Ct. 2891; *Piesco I*, 933 F.2d at 1154–55; *Roth*, 856 F.2d at 1407. Thus, "it is the court's task to apply the [balancing test] to the

facts." *Waters*, 511 U.S. at 668, 114 S.Ct. 1878 (plurality opinion).

■ Reviewing the evidence ourselves, we conclude as a matter of law that the defendants' interest in the effective and efficient operation of the Division outweighed Lewis's First Amendment interest in refusing to present the proposed Lotto change before the Board in a positive manner. The defendants presented evidence that Lewis's speech would "potentially interfere" with the Division's operations. *Heil*, 147 F.3d at 109. Both Hickey and Drakeley testified that Lewis's refusal to promote the proposed change would result in negative publicity and decreased morale, in turn impairing the profitability of the lottery. Drakeley explained

> Mr. Lewis [is] Mr. Lottery, the key person with all the resources at his disposal. If he's not on board, it would quickly be known that it may not be a great thing and could then demoralize everybody involved and it may expose us to an unsuccessful game in the future.... [Lotto] was our primary source of funding ... and we were risking a lot and there was a lot of exposure here and it had to be pulled off successfully. There couldn't be any dissension publicly.

Hickey similarly testified that

> [Publicity is] very important. People have to believe in the integrity of any gambling put on by any establishment.... Bad publicity will ... drive the customer base away and affect the sales and revenue generated.

Hickey further testified that he was "disturbed" by Lewis's refusal to carry out a direct order, an act that necessarily implicated Division discipline. In sum, Hickey and Drakeley testified that Lewis's refusal to promote the change undermined the Lottery Unit's ability to do its job.

The defendants' predictions of disruption were not unreasonable, and plainly the effect of such disruption on Division operations could be substantial. The manner, time, and place of Lewis's refusal to speak weigh heavily on the side of the defendants. Lewis refused a direct order from his employer—issued both verbally and in writing—to pres-

ent the proposed Lotto change to the Board in a "positive" manner and to serve as project manager for the change. Thus, Lewis's refusal to speak to the Board was directed squarely at his superiors Hickey and Drakeley. Furthermore, the communications between Hickey and Lewis all took place during the workday and at the Division's offices. Finally, Lewis's refusal meant that the office would be deprived of its principal spokesperson on a matter of public policy at a public meeting before the Board. These facts support Hickey's view that Lewis's actions constituted insubordination and threatened to undermine the effective functioning of the office and the success of the proposed change. *See Connick,* 461 U.S. at 153, 103 S.Ct. 1684. This was not a "single, offhand comment directed to only one other worker," *Rankin,* 483 U.S. at 393, 107 S.Ct. 2891 (Powell, J., concurring), but a sustained refusal to follow the professional direction of a supervisor in a critical matter.

The nature of Lewis's responsibilities within the agency also favors the defendants' position. Lewis was a senior policymaking employee, whose job required confidentiality and public contact. *See McEvoy,* 124 F.3d at 103. Lewis managed over thirty employees, designed and implemented lottery games, and, at least until a public information officer for the Division was hired, acted as lottery spokesman with extensive interaction with the public and the media. His position as Lottery Unit head was publicly highlighted by his service with the National Association of State and Provincial Lotteries. Hickey's order that Lewis present and implement the change evidenced Hickey's recognition of Lewis's central role in the policymaking process.

This is a classic case of an employee "who is paid a salary so that [he] will contribute to an agency's effective operation" but who "begins to do or say things that detract from the agency's effective operation." *Waters,* 511 U.S. at 675, 114 S.Ct. 1878 (plurality opinion). In such a case, the agency may terminate the employee because a more compliant subordinate who agrees to publicly support and convey the agency's positions would allow the agency to do the job more effectively. *See*

*id.* Moreover, we cannot second-guess the judgment of Lewis's supervisors that effective operation of the lottery was dependent upon the proposed change being implemented. As the Ninth Circuit recently held, "we are most doubtful that the Constitution ever protects the right of a public employee in a policymaking position to criticize her employer's policies or programs simply because she does not share her employer's legislative or administrative vision." *Moran v. State of Washington,* 147 F.3d 839, 850 (9th Cir.1998). This is not to say that a high-level policymaking employee may never claim the protection of the First Amendment under *Pickering,* only that a public employer's interests in running an effective and efficient office are given the utmost weight where a high-level subordinate insists on vocally and publicly criticizing the policies of his employer.

In sum, after weighing Lewis's significant interest in speaking (or not speaking) on a matter of public concern against the defendants' interest in the efficient and effective fulfillment of the Division's mission, we conclude that the latter outweighs the former. The defendants did not violate Lewis's First Amendment rights by terminating him based on Hickey's reasonable belief that Lewis's refusal to present the change to the Board in a "positive" manner might impair Division operations.

One aspect of this case gives us brief pause. We have previously recognized "the exceptional significance of a government employee's interest in testifying truthfully before a legislative committee." *Piesco I,* 933 F.2d at 1157. In *Piesco I,* the plaintiff, Dr. Piesco, was Deputy Personnel Director for Examinations in the New York City Department of Personnel, a senior position with supervisory responsibility over a staff of greater than 175 employees. A superior at the Department decided to set the passing grade for a written Department exam at 85, although Dr. Piesco had advocated a more challenging passing grade of 89. Later, Dr. Piesco was summoned to appear before a committee of the State Senate. A senator asked Dr. Piesco whether "a functional illiterate" could pass the exam, and Dr. Piesco answered affirmatively. Dr. Piesco was

eventually discharged from her position, at least in part because her superiors objected to her testimony before the Senate committee. *See id.* at 1151–53.

Dr. Piesco brought a § 1983 action for wrongful discharge and retaliation in violation of the First Amendment. The district court granted the defendants' motion for summary judgment. We affirmed in part, vacated in part, and remanded. Applying *Pickering* and its progeny, we decided that "the burden of caution a high ranking official such as Dr. Piesco normally bears when commenting on organizational matters is mitigated by the necessity for candor in the legislative forum." *Id.* at 1157. We explained that "[r]equiring less than candor and honesty from witnesses appearing before legislative committees would undermine our system of government" and we declined to read into the First Amendment a restriction requiring a person to temper testimony before a legislative committee so as not to exacerbate a sensitive issue. *See id.* at 1159. We refused to force employees like Dr. Piesco to choose between answering questions honestly and risk being fired on one hand, and committing perjury on the other. We held that the defendants had failed to produce sufficient evidence that Dr. Piesco's testimony interfered with government operations in a manner outweighing Dr. Piesco's strong interest in testifying truthfully. *See id.* at 1159–60.

Lewis argues that, like Dr. Piesco, his First Amendment interest in testifying honestly before the Gaming Board outweighs the defendants' demonstrated interests. We agree that Lewis had a strong First Amendment interest in testifying truthfully before the Board but we do not believe that interest to have been implicated here. Lewis was directed to present the Division's views, not his own. Although Lewis understood Hickey's order to mean that he should "lie" to the Board, there is no evidence that Hickey or anyone else ordered Lewis to misrepresent either the facts or his personal views to the Board.

The dilemma faced by a public employee who privately disagrees with his superiors on matters of public policy is not an uncommon one. A well-respected senior policymaking employee with public speaking responsibilities who objects to a position held by his superior frequently may be forced to choose between speaking out in favor of his supervisor's program and keeping his job, or voicing his personal opinion and perhaps losing his job. That is what has happened here.

We also conclude that the district court erred in refusing to grant the defendants' motion for judgment as a matter of law at the close of evidence on the basis of qualified immunity. The qualified immunity doctrine shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034 (internal quotation marks and citations omitted). *See also Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir.1993).

In determining that Hickey had violated a clearly established right of which a reasonable person should have known, both the district judge and the magistrate judge identified the right at issue as the "freedom of speech." The district court held that "[b]ecause the right to freedom of speech is ... 'clearly established ...,' the defendants are not entitled to qualified immunity as to the plaintiff's first amendment freedom of speech claim." The magistrate judge adopted this reasoning in denying the defendants' post-trial motion.

The district and magistrate judges defined the right in question far too broadly. The relevant inquiry is not whether the defendants should have known that there was a

federal right, in the abstract, to "freedom of speech," but whether the defendants should have known that the specific actions complained of violated the plaintiff's freedom of speech. Such an inquiry requires that a court define the constitutional right with some specificity. "[I]f the right is defined too broadly, 'plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *LaBounty*, 137 F.3d at 73–74 (quoting *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034); *see also Mozzochi v. Borden*, 959 F.2d 1174, 1178 (2d Cir.1992); *Bates v. Hunt*, 3 F.3d 374, 379 (11th Cir.1993); *Melton*, 879 F.2d at 729 n. 37. The present case illustrates the problem of defining the right too broadly. Under the district court's formulation, no defendant in any First Amendment action could ever successfully assert the qualified immunity defense.

■ We think the proper qualified immunity question in this case is whether the defendants should have known that terminating a policymaking public employee for refusing to promote agency policy as directed by his employer would violate the First Amendment. As this opinion indicates, the magistrate judge should have answered this question in the negative. A highranking policymaking employee does not have, and never has had, a First Amendment right to refuse his employer's directive to promote agency policy.

## II. *State Law Wrongful Discharge*

■ The jury found all three defendants liable under state common law for wrongfully terminating Lewis in violation of an important public policy. The defendants claim that Conn. Gen.Stat. § 4–165 immunizes them from personal liability. We agree, vacate the jury's verdict, and dismiss the claim.

■ Under Connecticut law, an at-will employee such as Lewis may sue his employer for wrongful discharge in violation of the implied covenants of good faith and fair dealing if the reason for the discharge violates an important public policy. *See Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385, 386–87 (Conn.1980). Defendants

argue that it was error to submit the wrongful discharge claim to the jury because Conn. Gen.Stat. § 4–165 provides: "no state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment." Over the defendants' objection, the magistrate judge refused to charge the jury on the potential availability of a § 4–165 immunity defense.

This was error. However, we have no need to remand this issue for further jury consideration because in his brief to this court, Lewis has conceded the absence of wanton, reckless, or malicious behavior. This concession convinces us of the absence of any factual basis for the jury to conclude that the defendants were not immune.

## CONCLUSION

The judgments of the district court are reversed. We conclude that the plaintiff did not engage in protected speech under the *Pickering* test and that, in any event, the defendants enjoy qualified immunity from plaintiff's § 1983 action based on the First Amendment. In addition, the defendants are not liable under state law for wrongfully terminating Lewis in violation of an important public policy, because they are immune from liability as a matter of state law. Lewis is not entitled to compensatory damages, punitive damages, or attorney's fees under the state or federal causes of action.

WEINSTEIN, District Judge, concurring:

I concur. Yet, I respectfully submit, the important issue of free speech discussed in the majority opinion, relying on the line of cases beginning with *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968),—requiring a balancing approach to the right of government employees to speak (or remain silent) on a matter of public concern—need not be addressed.

The head of an important state governmental unit is not prevented by the United States Constitution from firing, on grounds untinged by invidious or other illegal considerations, a chief assistant who has substantial

discretionary powers and who opposes a key departmental decision or policy. *Cf. Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *McEvoy v. Spencer,* 124 F.3d 92, 99 (2d Cir.1997) ("This Circuit has interpreted *Branti*'s version of the policymaker exception to mean that 'political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance.'" (quoting *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988))); *Gordon v. County of Rockland,* 110 F.3d 886, 890 (2d Cir.1997) ("[E]ach of the three plaintiffs served as a liaison and advisor to a policymaking commission. It is difficult to fathom how such responsibilities can be undertaken and done well without their 'political or social philosophy [making] a difference in the implementation of programs.'" (quoting *Savage v. Gorski,* 850 F.2d 64, 69 (2d Cir.1988))); *Regan v. Boogertman,* 984 F.2d 577, 581–82 (2d Cir.1993) ("The reasoning of *Elrod* and *Branti* is applicable even ... where the firing occurs without a change in administration.... It is logical for an administration to expect that once committed to certain policies its key members will adhere to and implement those policies."); *see also Fazio v. City & County of San Francisco,* 125 F.3d 1328, 1332 (9th Cir.1997) ("If ... a public employee is a policymaker, then the claim would fall under the rubric of *Elrod* and *Branti*.").

As Chief of the Connecticut State Lottery Unit, the plaintiff was a policymaker unprotected by the United States Constitution from being fired when he refused to carry out a superior's policy directives, and there was no invidious predicate for dismissal. *See McEvoy v. Spencer,* 124 F.3d 92, 104 (2d Cir.1997) (police commissioner); *Gordon v. County of Rockland,* 110 F.3d 886 (2d Cir. 1997) (county attorney); *Vezzetti v. Pellegrini,* 22 F.3d 483 (2d Cir.1994) (highway superintendent); *Regan v. Boogertman,* 984 F.2d 577 (2d Cir.1993) (deputy tax receiver); *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988) (confidential secretary to director of county correctional facility; coordinator for pre-trial release services; and first deputy service officer for county veterans service agency).

Other Circuits have recognized equivalent positions as "policymaking" within the meaning of *Branti* and *Elrod. See, e.g., Flynn v. City of Boston,* 140 F.3d 42 (1st Cir.1998) (associate director of administration and finance and associate director for field operations of city agency); *Fazio v. City & County of San Francisco,* 125 F.3d 1328 (9th Cir. 1997) (assistant district attorney); *Jenkins v. Medford,* 119 F.3d 1156 (4th Cir.1997) (en banc) (deputy sheriff); *Cutcliffe v. Cochran,* 117 F.3d 1353 (11th Cir.1997) (deputy sheriff); *Peters v. Delaware River Port Auth.,* 16 F.3d 1346 (3d Cir.1994) (Secretary of transit authority); *Selch v. Letts,* 5 F.3d 1040 (7th Cir.1993) (subdistrict superintendent of highway department); *Faughender v. City of North Olmsted,* 927 F.2d 909 (6th Cir.1991) (mayor's personal secretary); *Green v. Henley,* 924 F.2d 185 (10th Cir.1991) (administrator of transportation division of state commission); *Bauer v. Bosley,* 802 F.2d 1058 (8th Cir.1986) (staff legal assistant in court clerk's office); *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (regional director of urban development and housing corporation); *Brown v. Trench,* 787 F.2d 167 (3d Cir.1986) (assistant director of public information); *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985) (first deputy commissioner of water department).

One of the core functions of the plaintiff's job as Lottery Unit Chief was to promote Connecticut's state lottery under the supervision of the Executive Director of the Division of Special Revenue. His duties required him to act as "the official lottery spokesman" to the public and to represent the agency's position before the Gaming Policy Board. He now claims that his First Amendment rights were violated because he refused to speak in support of the lottery format favored by his superior, the Executive Director.

When promotion of a particular plan is an essential feature of employment, as it often is for policy-makers such as plaintiff, an employer is not prevented by the United States Constitution from firing an individual for his insistence that he will not support the superior's program. If the *Pickering* test were applied in cases such as Lewis', courts would be unnecessarily burdened with complicated

"balancing" of factors in cases which do not implicate constitutionally protected free speech, for example, the claim of a speech writer who refuses to compose a political oration because he disagrees on policy grounds with the underlying message.

The issues of constitutional law must be distinguished from those of sound employer-employee relationships. Termination is usually a counterproductive method of dealing with every instance where a policy-making subordinate conscientiously objects to promoting a particular departmental policy. Some tolerance for differing views is desirable for the effective functioning of any governmental unit. Insensitivity and thin-skinned demands for absolute obedience by higher-ups can unnecessarily sacrifice the careers of dedicated and talented public servants. As a matter of ethics and management, rational minds can disagree over the appropriate degree of tolerable dissent. The issue is not, however, usefully characterized as one of controlling constitutionally protected speech.

The defendant had legitimate reason to believe that the plaintiff was unwilling or incapable of performing his job. While we may question the propriety of the dismissal from an ethical or managerial standpoint, there is no grounds for questioning its constitutionality. In cases such as this one we should look for solutions to the healing ministrations and skills of experts on employee-employer relations rather than to the balancing scales and sword of the law. To import sophisticated rules of free speech into such cases as the instant one promises to interfere with government efficiency and to burden the courts with personnel disputes that should be settled by the executive hierarchy.