John EIDEN, Plaintiff,

v.

Gina McCARTHY and Linda Yelmini, Defendants.

No. 3:05CV01411(DJS).

United States District Court, D. Connecticut.

Jan. 28, 2008.

John R. Williams, New Haven, CT, for Plaintiff.

Maria C. Rodriguez, Attorney General's Office, Hartford, CT, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The Plaintiff, John Eiden ("the Plaintiff") brings this action against the Defendants, Gina McCarthy ("McCarthy") and Linda Yelmini ("Yelmini") (collectively, "the Defendants"), pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the First and Fourteenth Amendments to the United States Constitution. Now pending before the court is the Defendants' motion for summary judgment (dkt.# 29) pursuant to Rule 59 of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.").[1] For the reasons that hereafter follow, the Defendants' motion for summary judgment (**dkt.# 29**) is **GRANTED**.

## I. THE PLAINTIFF'S SUBMISSIONS

Before setting forth the background facts of this case, the court notes that the Plaintiff has failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut ("D.Conn.L.Civ. R.") in a number of ways. Local Rule 56(a)(1) provides that "[t]here shall be annexed to a motion for summary judgment a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in separately numbered paragraphs ... a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). Under Local Rule 56(a)(2),

[t]he papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)2 Statement," which states in separately numbered paragraphs ... corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement wheth-

er each of the facts asserted by the moving party is admitted or denied.

D. Conn. L. Civ. R. 56(a)(2). In a Local Rule 56(a)(2) Statement, the party opposing summary judgment must also set forth, in a separate section, "Disputed Issues of Material Fact." D. Conn. L. Civ. R. 56(a)(2). "All material facts set forth in [the moving party's Local Rule 56(a)1] [S]tatement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2." D. Conn. L. Civ. R. 56(a)(1).

Furthermore, pursuant to Local Rule 56(a)(3),

Each statement of material fact by a movant in a Local Rule 56(a)(1) Statement, or by an opponent in an Local Rule 56(a)(2) Statement, and each denial in an opponent's Local Rule 56(a)(2) Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial.

D. Conn. L. Civ. R. 56(a)(3). "[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)(1)...." D. Conn. L. Civ. R. 56(a)(3).

■ The court first notes that, by the court's reckoning, the Plaintiff has admitted to 71 out of the 83 paragraphs contained in the Defendants' Local Rule 56(a)(1) Statement. Many of the remaining twelve responses are, however, wholly inadequate. With regard to Paragraphs 17, 18, 76, 77, 80, and 81 of the Defendants'

**1.** The Defendants' motion asks the court to dismiss the claims brought against them in their individual capacities for insufficient service of process. To the extent that the Defen-

dants request such relief, the court shall treat their motion as a motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

Local Rule 56(a)(1) Statement, the Plaintiff has responded "Plaintiff has no knowledge." Such a response, however, in not permitted under the Local Rules. Unlike the Federal Rule for answering a complaint, which allows a party to state that he lacks knowledge sufficient to form a belief about the truth of an allegation, *see* Fed.R.Civ.P. 8(b)(5), the Local Rule for a responding to a 56(a)(1) Statement demands that each of the facts asserted by the moving party be either admitted or denied, *see* D. Conn. L. Civ. R. 56(a)(2). This is because "[a] party responding to a motion for summary judgment presumably has conducted discovery and should have a reasonable, factually supported basis to admit or deny any factual assertions made in the case." *Hogan v. Conn. Judicial Branch,* 220 F.Supp.2d 111, 115 n. 1 (D.Conn.2002). Thus, the court shall deem admitted any statement with which the Plaintiff claims he lacks sufficient knowledge to agree or disagree.[2] *See id.*

The court also finds fault with the Plaintiff's responses (all of which are denials) to Paragraphs 13, 19, 26 and 83 of the Defendants' Local Rule 56(a)(1) Statement. The Plaintiff's denial of Paragraph 26 contains no citation whatsoever. Therefore, the court shall deem admitted Paragraph 26. The Plaintiff's denial of Paragraph 13 does contain a citation to one of the Plaintiff's interrogatory answers; however, upon review of that interrogatory answer, the court finds that it does not support the

Plaintiff's denial. Therefore, the court shall deem admitted Paragraph 13.

Finally, the Plaintiff's denials of Paragraphs 19 and 83 are inappropriate. To begin with, these denials contain no citations; thus, Paragraphs 19 and 83 should be deemed admitted on that account. Moreover, the Plaintiff's reasons for denying those Paragraphs demonstrate a misunderstanding of when and why a party should deny a fact asserted in a Local Rule 56(a)(1) Statement. In Paragraph 19, the Defendants state the following: "In a memorandum dated June 9, 2004, Mr. Eiden was informed that his job duties would be changed to remove any job duties that were inconsistent with the position of General Worker." (Dkt. # 29, Defs.' Local R. 56(a)(1) Statement ¶ 19.) The Plaintiff denied this Paragraph in part because he disagreed with the words "duties that were inconsistent with the position of a General Worker." (*See* dkt. # 32, Pl.'s Local R. 56(a)(2) Statement ¶ 19.) When looking at the memorandum dated June 9, 2004, though, it is clear that the Plaintiff was informed that his job duties would be changed to remove any job duties that were inconsistent with the position of General Worker. (*See* dkt. # 29, Ex. 1.) That is to say, it is a fact that the June 9, 2004 memorandum does state that the reason for the changes in the Plaintiff's job duties was to remove those functions inconsistent with his position. If the memorandum did not state the reasons for the change in job

---

**2.** The court is aware that "in determining whether the moving party has 2 met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local] Rule 56[] statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004); *see Giannullo v. City of New York,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (stating that,

"although [Local] Rule 56[] is designed to streamline the district court's consideration of summary judgment motions," not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts"). Here, upon review of the evidence cited by the Defendants, the court is satisfied that the Defendants' citations to the record support the factual assertions contained in their Local Rule 56(a)(1) Statement.

duties, the Plaintiff's denial would be appropriate. The Plaintiff cannot, however, deny Paragraph 19 in his 56(a)(2) Statement simply because he disagrees with the content of the memorandum. Therefore, the court shall deem admitted Paragraph 19.

The same holds true with regard to the Plaintiff's denial of Paragraph 83. Paragraph 83 reads as follows: "The defendants ... contested personal jurisdiction in their individual capacities in the Rule 26(f) Report of the Parties Planning Meeting." (Dkt. # 29, Defs.' Local R. 56(a)(1) Statement ¶ 83.) The Plaintiff responded, "Disagree because a statement in a 26(f) report does not constitute contesting personal jurisdiction, which must be raised by a motion pursuant to F[ed]. R. Civ. P. 12(b)(2)." (*See* dkt. # 32, Pl.'s Local R. 56(a)(2) Statement ¶ 19.) Again, the Plaintiff's denial here is inappropriate. The purpose of the Rule 56 Statements is to help the court determine *the facts* of a case, whereas the parties' *legal arguments* are properly submitted in the memoranda of law. Thus, if the Defendants have contested personal jurisdiction in their individual capacities in the Rule 26(f) Report, then the Plaintiff must admit to this fact. There is no question that the Defendants did, in fact, do so. (*See* dkt. # 14.) The Plaintiff cannot deny this fact simply because he believes that personal jurisdiction over the Defendants in their individual capacities is appropriate.[3] Again, such an argument is proper for the Plaintiff's opposition memorandum. Therefore, because it is beyond doubt that the Defendants contested personal jurisdiction in their individual capacities in the Rule 26(f) Report, the court shall deem admitted Paragraph 83.

## II. FACTS

The Plaintiff was hired as a General Worker by the Department of Environmental Protection ("the DEP") for the State of Connecticut on January 29, 1999. On December 10, 2004, McCarthy was appointed as the Commissioner for the DEP. Yelmini was hired by the State of Connecticut in June 1987; on October 1, 1997, Yelmini was appointed to the position of Director of the Office of Labor Relations for the State of Connecticut, and on December 24, 2004, she was appointed as the Commissioner for the Department of Administrative Services ("the DAS") for the State of Connecticut. Lisa J. Piccarello ("Piccarello"), who is not a party to this case, is the Agency Personnel Administrator II for the DEP. Piccarello is responsible for maintaining personnel files for employes of the DEP, and for maintaining files for individuals applying for positions at, and promotions within, the DEP.

When he was hired at the DEP as a General Worker, the Plaintiff was told that he would be paid $10.00 per hour with no benefits. All individuals hired as General Workers were paid on an hourly basis with no benefits. The General Worker position was not a permanent position in state service. In fact, the Plaintiff's position as a General Worker position was "unclassified," meaning that it was not part of the civil service system, although it did have a DAS job description. The job description in effect in January of 1999 for a General Worker provided that General Workers could provide program support and technical support to Connecticut agencies, and that General Workers were paid an hourly rate. There was no requirement that an individual applying for a General Worker position have any specific experience. In

**3.** Moreover, admitting to the fact that the Defendants contested the court's jurisdiction in the Rule 26(f) Report does not mean that the Plaintiff concedes the Defendants' argument.

November of 2004, there were approximately 370 General Workers employed by the State of Connecticut, with approximately 29 employed at the DEP.

In contrast to those hired as General Workers, individuals hired into "classified" positions in the Connecticut's civil service system must meet the minimum eligibility requirements for those positions. Classified service includes "competitive" positions, for which an individual must meet the minimum requirements contained in the job description and pass an examination, and "noncompetitive" positions, for which an individual need only meet the minimum requirements contained in the job description.

When the Plaintiff was hired as a General Worker, he worked in the Underground Storage Tank Enforcement Program ("USTEP") within the Oil & Chemical Spills Division of the Bureau of Waste Management at the DEP. His duties were to perform data entry, make phone calls to verify the closure of tank systems, answer phone calls, update information, and perform filing tasks. One of the Plaintiff's primary duties was data entry on the backlog of EPHM–6 notification forms. The Plaintiff also performed field inspections, help respond to Freedom of Information Act requests, and prepare boilerplate consent orders.

It appears that the Plaintiff eventually became dissatisfied with the terms and conditions of his status as a General Worker. In May 2004, the Plaintiff apparently wrote to State Senator Edith Prague ("Senator Prague") of his belief that he was "being used" by the DEP. According to the Plaintiff, he was being worked "out of his class" and not "justly rewarded for [his] dedication and service to [the] State." (See dkt. # 29, Ex. 4.) The Plaintiff complained that he was required to perform work identical to that of better-compensated workers, and asked Senator Prague for "guidance." (See id.) The Plaintiff admits that did not send this letter to anyone other than Senator Prague, and that he cannot state whether anyone at the DEP was aware of his letter when he sent it.

Sometime in June 2004, Human Resources at the DEP was informed by the DAS that General Workers should be doing only entry-level assignments. Human Resources then informed the Bureau of Waste Management that all General Workers should be doing entry-level assignments only. Then, in a memorandum dated June 9, 2004, the Plaintiff was informed that, in order to conform to the job specifications for General Workers, his job duties would be changed so that he performed only data entry, filing, phone coverage, photocopying, and cabinet reorganization.

Prior to June 1, 2004, the Plaintiff became aware that USTEP was interviewing individuals to be hired to work in his unit. DAS records indicate that on June 1, 2004, the Plaintiff, apparently interested in a USTEP position, sent an email to Diane Fitzpatrick, a Human Resources Consultant for the DAS, regarding receiving credit for work he did as a General Worker. On July 1, 2004, a meeting was held with the Plaintiff, a member of Human Resources, Diane Ragali ("Ragali"), and USTEP staff members. In that meeting, Human Resources agreed to consider the Plaintiff's experience as a General Worker, but indicated that written documentation of his job duties from his supervisor was needed. That same day, the Plaintiff submitted a cover letter, a résumé, and an Application for Examination or Employment, PDL–1 form, to the Human Resources Division of the DEP. In the cover letter, the Plaintiff asked the DEP to review and evaluate his current duties, and consider his request for appointment to a permanent classified position.

On July 27, 2004, Scott Deshefy ("Deshefy"), the Plaintiff's supervisor, submitted a memorandum containing a summary of the Plaintiff's training and experience as a General Worker, specifically the Plaintiff's experience with USTEP. The Plaintiff, upon review of the memorandum, agreed with Deshefy's description of the Plaintiff's training and experience. Based on Deshefy's memorandum and the Plaintiff's application, personnel at the DEP determined that the Plaintiff was qualified for the position of Inspection Aide. In addition, between January 2002 and December 2004, there were at least twelve positions posted at the DEP for which the Plaintiff was qualified. According to the Defendants, the Plaintiff did not apply for any of those positions, while the Plaintiff argues that he applied for any position for which he was qualified. The Plaintiff admits, however, that he never submitted an Application for Examination or Employment PLD–1 form with regard to a specific position opening, and that he never applied for an examination with the DAS. The Defendants contend that, at the time it was determined that the Plaintiff was qualified for the position of Inspection Aide, there were approximately 21 individuals who would qualify before him based on the "Reemployment/SEBAC lists" of laid-off state employees, who had rights to the position before any agency could hire anyone not on the lists.

On or about September 22, 2004, the Plaintiff wrote another letter, this time to Governor M. Jodi Rell ("Governor Rell"), regarding his employment as a General Worker. (*See id.*) In his letter to Governor Rell, the Plaintiff reiterated the complaints he made in his letter to Senator Prague. (*See id.*) The Plaintiff also stated that, on June 9, 2004, he "was stripped of all job duties," having been told by a supervisor that he had been performing job duties inconsistent with the duties assigned to General Workers. (*See id.*) The Plaintiff represented that his job duties would be limited to that of a "secretary." (*See id.*) According to the Plaintiff, since he began questioning the treatment of General Workers, he had been threatened with termination, informed that his position would not be renewed, and told that if he had not questioned these issues, he would still be performing the his previous job duties. (*See id.*)

On or about November 24, 2004, the Governor Rell's Office directed that, effective January 1, 2005, benefits would be extended to all General Workers. In a letter dated November 24, 2004, the Plaintiff was informed that benefits were being extended to General Workers effective January 1, 2005, and that the classification of "General Worker" would not be used at the DEP after July 1, 2005. The letter also stated that there would be an effort to place General Workers in a permanent position, and that, between the date of the letter and June 30, 2005, General Workers should apply for all positions for which they were qualified. General Workers who chose not to apply to any such positions would be separated "in good standing" on June 30, 2005.

After November 24, 2004, all General Workers who were employed by the DEP were offered a permanent, classified position prior to July 1, 2005. All General Workers at the DEP, except the Plaintiff, accepted these positions. The Plaintiff apparently did not agree with Human Resources that he qualified for an Inspector Aide position. At a meeting with the Plaintiff, Senator Prague, Ragali, William Evans of the DEP, and a representative from the Governor's Office, it was determined that DAS would do an independent audit to determine those positions for which the Plaintiff qualified. The Plaintiff then met with Fitzpatrick to determine for which positions the Plaintiff qualified.

On December 1, 2004, there was an information hearing before the Labor and Public Employees Committee of the General Assembly for the State of Connecticut regarding the issue of General Workers. Acting DEP Commissioner Jane Stahl ("Stahl") prepared a written statement that was submitted to the Labor and Public Employees Committee for this hearing. In her statement, Stahl indicated that it was not the DEP's intention to use General Workers for long-term employment, although the job description did not specify that the employment was to be for a limited duration. She also noted that employment as a General Worker for three years or more was an anomaly. The Plaintiff, for his part, testified at the hearing. According to the Plaintiff, he questioned the rights of General Workers at this hearing.

On January 24, 2005, Yelmini received an email from the Plaintiff regarding whether he would receive retroactive benefits. Yelmini responded to the Plaintiff's email by stating that she needed some type of statutory or contractual authority to pay him for work done in the past, and that, to her knowledge, no such authority existed.

By an email dated January 25, 2005, the Plaintiff was assigned to the Remediation Program under Doug Zimmerman. The Plaintiff was informed in that email that he would be doing duties consistent with the General Worker job description.

In February 2005, Fitzpatrick concluded her review of the Plaintiff's qualifications for classes within the State's classified service, and she submitted her report on February 18, 2005. Fitzpatrick determined that the Plaintiff was qualified for the classified position of Inspection Aide, and in a memorandum dated February 18, 2005, she informed Ragali of this finding. The Plaintiff was informed of this finding in a memorandum dated February 23, 2005. On that same date, however, the Plaintiff requested an immediate separation from State service because he had no intention of applying for a permanent appointment within State service. Nevertheless, on June 8, 2005, the Plaintiff was offered the position of Inspection Aide, which he declined. On June 30, 2005, the Plaintiff was separated from State service.

## III. DISCUSSION

The Plaintiff has brought this action against the Defendants in their individual and official capacities pursuant to 42 U.S.C. § 1983, alleging that they have violated his Fourteenth Amendment equal protection rights, and that they have retaliated against him for exercising his First Amendment rights. Title 42, Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1979) (citing *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999).

The Defendants argue the following: (1) pursuant to Rule 12(b)(5), the court should dismiss all claims brought against them in

their individual capacities for insufficient service of process; (2) the court should grant summary judgment in their favor on the Plaintiff's Fourteenth Amendment equal protection and First Amendment retaliation claims because they fail as a matter of law; and (3) the Defendants are entitled to qualified immunity as a matter of law. The court shall analyze the Defendants' arguments seriatim.

## A. STANDARDS

### 1. Rule 12(b)(5) Motion to Dismiss

"Under Rule 12(b)(5), a party may file a motion to dismiss due to insufficiency of service of process." *Rzayeva v. United States,* 492 F.Supp.2d 60, 74 (D.Conn.2007) (citing Fed.R.Civ.P. 12(b)(6); *Greene v. Wright,* 389 F.Supp.2d 416, 426 n. 2 (D.Conn.2005)). "A motion to dismiss pursuant to Rule 12(b)(5) must be granted if the plaintiff fails to serve a copy of the summons and complaint on the defendants pursuant to Rule 4 of the Federal Rules, which sets forth the federal requirements for service." *Id.* (citing *Cole v. Aetna Life & Cas.,* 70 F.Supp.2d 106, 110 (D.Conn.1999)). "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate." *Id.* (internal quotation marks omitted).

### 2. Summary Judgment

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. SERVICE OF PROCESS/PERSONAL JURISDICTION OVER THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES

The Defendants argue that the Plaintiff's summons and complaint were not properly served upon them. Under Rule 4 of the Civil Rules of Civil Procedure, service upon an individual from whom a waiver of service has not been obtained may be effected

(1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

(2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies

thereof at the individual's dwelling house or usual place of abode ... or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Fed.R.Civ.P. 4(e).

 The record in this case indicates that the Plaintiff served the Defendants by leaving a copy of the summons and complaint with Gregory T. D'Auria at the Office of the Attorney General of the State of Connecticut. Under Connecticut law, such service is appropriate when bringing a civil action against (1) the State; (2) any institution, board, commission, department or administrative tribunal of the State; or (3) any officer, servant, agent or employee of the State or of any such institution, board, commission, department or administrative tribunal. Conn. Gen.Stat. § 52–64. Nevertheless, "[s]ervice on [a] defendant ... through the Attorney General ... is insufficient to subject her to suit in her individual capacity." *Burgos v. Dep't of Children & Families,* 83 F.Supp.2d 313, 316 (D.Conn.2000); *see* Fed.R.Civ.P. 4(e); Conn. Gen.Stat. § 52–57(a) (service of process upon an individual "any civil action shall be served by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state").

The Plaintiff does not claim that he has served the summons and complaint on the Defendants personally, or that he has left copies of the summons and complaint at the Defendants' dwelling houses or usual places of abode, or that he has delivered a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process on behalf of the Defendants in their individual capacities. Instead, the Plaintiff argues

that the Defendants waived their insufficient service of process claim by failing to make a "timely" motion to dismiss pursuant to Rule 12(b)(5). According to the Plaintiff, Rule 12(h)(1), which discusses when certain defenses are waived, supports this position.

In the court's view, the Plaintiff's analysis of Rule 12(h)(1) is incomplete. Rule 12(h)(1) reads as follows: "A defense of ... insufficiency of service of process is waived (A) if omitted from a motion [to dismiss brought pursuant to Rule 12], or (B) if it is neither made by motion under this rule nor included in a responsive pleading...." Fed.R.Civ.P. 12(h)(1). Upon review of the docket in this case, the court first notices that the Defendants never filed a motion to dismiss prior to the instant motion, but instead filed their answer to the complaint.

 Nevertheless, the Defendants did not need to bring a motion to dismiss at all in order to preserve their defense. Under Rule 12, the defense is preserved so long as it is made by motion under this Rule 12 or included in a responsive pleading. *See* Fed.R.Civ.P. 12(h)(1). Thus, if the Defendants raised the insufficiency of service of process in a responsive pleading, the defense is preserved. The Defendants claim that their defense is preserved because they did, in fact, raise it in a responsive pleading, i.e., their answer.[4]

The court agrees with the Defendants. In their third affirmative defense, the Defendants state the following: "The court lacks personal jurisdiction [over] the defendants in their individual capacities." (Dkt.# 16.) As has been noted, "courts in [the Second] Circuit, without requiring a prior motion to dismiss, have granted sum-

---

**4.** The Defendants also claim that they raised the defense in the parties' Rule 26(f) Report. The court notes, however, that a Rule 26(f) Report is not a "pleading" under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(a).

mary judgment for improper service when defendants raised 'personal jurisdiction' as an affirmative defense in their Answer." *Lange v. Town of Monroe*, 213 F.Supp.2d 411, 421 (S.D.N.Y.2002); *see Moultry v. City of Poughkeepsie*, 154 F.Supp.2d 809, 812–13 (S.D.N.Y.2001). It is clear, then, that the Defendants did raise this affirmative defense in their answer.[5] Thus, the Plaintiff's waiver argument is without merit, and his claims against the Defendants in their individual capacities must be dismissed.

■ The court also agrees with the Defendant's argument that the Plaintiff has failed to demonstrate how either McCarthy or Yelmini was personally involved in the alleged wrongful conduct. Liability under 42 U.S.C. § 1983 is imposed on state officials only for personal involvement in a constitutional violation. *See Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987) ("Absent some personal involvement by [a defendant] in the allegedly unlawful conduct of his subordinates, he cannot be held liable under section 1983."). "Liability may not be premised solely on the fact that an official has a high-ranking position in an organization, *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir.1995), or plays a supervisory role[,] *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986)." *Sweeney v.*

*Dunbar*, No. 3:05CV00580(PCD), 2007 WL 842010, at *3 (D.Conn. Mar. 19, 2007). Furthermore, respondeat superior is not a recognized basis for § 1983 liability. *See Monell v. New York City Dep't. of Social Servs.*, 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ The Plaintiff presents no evidence demonstrating the personal involvement of the Defendants in this case. Therefore, even if the service of process had been proper, the claims against the Defendants in their individual capacities must be dismissed. Upon review of the facts above, it appears that much of the alleged wrongful conduct taken against the Plaintiff occurred before the Defendants were made Commissioners of their respective departments (e.g., the Plaintiff's job duties were changed in June 2004, but McCarthy was not made Commissioner of the DEP until December 10, 2004, and Yelmini was not made Commissioner of the DAS until December 24, 2004). Consequently, insofar as it asks the court to dismiss all the Plaintiff's claims against the Defendants in their individual capacities, the Defendants' motion (**dkt.# 29**) is **GRANTED**. All claims brought against the Defendants in their individual capacities are hereby **DIS-MISSED**.

5. The court cautions the Defendants, however, to use more specific language when raising affirmative defenses. The court has found case law holding that a "lack of personal jurisdiction" defense does not, under Rule 12, concurrently raise or preserve an insufficiency of service of process defense. *See Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36, 41–42 (D.Conn.1996); *Fed. Home Loan Mortgage Corp. v. Dutch Lane Assocs.*, 775 F.Supp. 133, 137 (S.D.N.Y.1991); *see also Roque v. United States*, 857 F.2d 20, 21–22 (1st Cir.1988). "If the Federal Rules of Civil Procedure manage to clearly and separately identify an 'insufficiency of service of process' defense from a 'lack of jurisdiction over the person' defense, it places no meaningful burden on defendants

to require them to do the same." *Fed. Home Loan Mortgage Corp.*, 775 F.Supp. at 137. That is, if a party is bringing insufficient service of process, she should say "insufficient service of process." Here, because the Defendants alleged that the court lacked personal jurisdiction over them in their individual capacities, it was apparent that they were, in fact, alleging insufficient service of process. The Plaintiff, for his part, did not address this issue. Instead, the Plaintiff merely mentioned in his Local Rule 56(a)(2) Statement that a Rule 26(f) Report is not the proper vehicle in which to bring this affirmative defense; this argument is ineffectual, though, as the Defendants also brought this defense in their answer.

## C. EQUAL PROTECTION

■ In the complaint, the Plaintiff asserts that "the defendants have subjected [him] to a deprivation of his rights to equal protection of the laws, in violation of the Fourteenth Amendment to the United States Constitution...." (Dkt. # 1 ¶ 17.) The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has held that the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■ "Traditionally, the Equal Protection clause of the Fourteenth Amendment protects against [classification-based] discrimination." *Goldfarb v. Town of West Hartford,* 474 F.Supp.2d 356, 366 (D.Conn. 2007) (internal quotation marks omitted). That is to say, the courts

> apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose.... Classifications based on race or national origin ... and classifications affecting fundamental rights ... are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy.

*Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (internal citations omitted). As the Second Circuit has pointed out, rational basis review generally applies, whereas the higher forms of review (i.e., strict scrutiny and intermediate scrutiny) apply in the "limited circumstances" where "the subject of the different treatment is a member of a class that historically has been the object of discrimination." *Able v. United States,* 155 F.3d 628, 631–32 (2d Cir.1998).

■ In this case, however, the Plaintiff does not base his equal protection claim pursuant to the "traditional," i.e., classification-based, equal protection analysis, nor does he argue that he has been discriminated against because he is a member of one of the classifications traditionally protected by strict or intermediate scrutiny under the Equal Protection Clause. Instead, the Plaintiff asserts a "class of one" equal protection claim based on the Supreme Court's decision in *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). In *Olech,* the Supreme Court recognized that successful "class of one" equal protection claims can be brought "where the plaintiff alleges that [T]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* Courts allow plaintiffs to bring "class of one" claims because "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* (internal quotation marks omitted).

■ "In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005). "[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are *prima facie* identical." *Id.* at 105 (internal quotation

marks omitted); *see Goldfarb,* 474 F.Supp.2d at 366–67; *Inturri v. City of Hartford,* 365 F.Supp.2d 240, 251 (D.Conn. 2005) (holding that, to be considered similarly situated, "employees must be similarly situated in all material respects"). The Second Circuit requires a "class of one" plaintiff to show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson,* 409 F.3d at 105. "[T]his test is simply an adaptation of the rational review standard applicable to equal protection 'class of one' cases." *Id.* at 105 n. 3; *see Weinstein v. Albright,* 261 F.3d 127, 140 (2d Cir.2001) (noting that rational basis review applies to equal protection claims not based on plaintiff's membership in a suspect class or on effects of the challenged action on fundamental rights).

■ The Plaintiff has not met the standard for a "class of one" equal protection claim. To support such a "class of one" claim, the Plaintiff was required to demonstrate that he was treated differently from other employees who were similarly situated to him in all material respects. "Although '[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury [,] ... [t]his rule is not absolute ... and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Goldfarb,* 474 F.Supp.2d at 367 (quoting *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 n. 2 (2d Cir. 2001)).

In his Local Rule 56(a)(2) Statement, the Plaintiff identifies the following people, to whom he apparently claims he was similarly situated in all material respects: Deshefy, Omar Tyson ("Tyson"), Phil Wilde ("Wilde"), George Purple ("Purple"), Paul Clark ("Clark"), Dave Keating ("Keating"), Robert Shuler ("Shuler"), Helen Robbins ("Robbins") and Julie Soares ("Soares"). The parties have agreed to the following facts: (1) Deshefy, who was the Plaintiff's supervisor, was hired into a permanent classified position by the DEP on September 16, 1982, and was promoted to Environmental Protection Supervising Analyst on September 16, 1986; (2) Tyson, who was hired into a permanent classification position as an Engineer Intern on August 6, 2004, holds a Bachelor of Science Degree in Mechanical Engineering; (3) Wilde, who also had supervisory duties, was hired as an EP Seasonal Resource Assistant in 1985 and 1986. He was hired into a permanent classified position on June 20, 1986, and received promotions in 1987, 1988, 1989, 1995, and 2004. Wilde holds a Bachelor of Arts Degree in Biology Anthropology; (4) Purple, who had worked for Dow Chemical for 21 years before his retirement in June 1995, was hired as an EP Seasonal Resource Assistant on December 12, 1997. He was then hired as a General Worker on June 19, 1998. On September 10, 1999, he became an EP Engineering Aide 1, which position was made permanent on April 1, 2000. Purple was subsequently promoted in 2002 and 2003; (5) Keating began his State employment with the Department of Social Services. He was laid off from State service on January 24, 2003, and placed on a Reemployment/SEBAC list. On June 11, 2004, Keating was hired off the Reemployment/SEBAC list into a permanent position with the DEP, where he received a promotion in 2005. Keating holds an Associate Degree and a Bachelor of Science

Degree in Engineering Technology–Manufacturing; (6) Shuler was hired as a General Worker on February 10, 1995, and received a permanent classified position on August 18, 1995. He was promoted in 1996, 1997, and 1999; (7) Robbins was hired for a permanent classified position as an Engineer Intern on January 22, 1993, and received promotions in 1994, 1996, and 1998. Robbins holds a Bachelor of Engineering Degree in Chemical Engineering; (8) Soares was hired by the DEP for a permanent classified position as a Clerk on June 30, 1998, and received a promotion in 1999.[6]

Based upon the submissions to the court, it is clear that the Plaintiff's employment circumstances were not are *prima facie* identical to the employment circumstances of any of these people. All of the above-described people were materially different from the Plaintiff in at least one way, if not more.[7] Deshefy, Wilde, Purple, Shuler, Robbins, and Soares all began their State service before the Plaintiff started working at the DEP, some of them many years before. Tyson, who holds a college degree, was hired after the Plaintiff, but for a permanent classified position, not as a General Worker. Keating, who also holds a college degree, began his State employment in a different department than the Plaintiff's, was laid off from State service, placed on a Reemployment/SEBAC list, and re-hired by the State into a permanent position with the DEP. Wilde and Robbins also hold college degrees.

Indeed, the only people identified as "General Workers" were Purple, who, with

21 years of work experience before his State service, began his State service years before the Plaintiff, and Shuler, who was hired as a General Worker and then given a permanent classified position approximately four and a half years before the Plaintiff was hired. No rational finder of fact could conclude that the circumstances surrounding these individuals, who had different educational backgrounds, work experience, and job duties than the Plaintiff, were *prima facie* identical to the Plaintiff's circumstances. The Plaintiff's failure to identify similarly situated State employees who were treated differently from him is fatal to his "class of one" equal protection claim.

Furthermore, the court points out that the Plaintiff's legal arguments regarding the alleged equal protection violations are without merit. According to the Plaintiff, his position of "General Worker" constituted an equal protection violation in and of itself. (*See* dkt. 32.) The court fails to see how such an argument can support a "class of one" equal protection claim, considering there were hundreds of General Workers working for the State, 29 of whom worked in the DEP during the Plaintiff's employment.

The Plaintiff then goes on to state the following: "That distinction [between General Workers and permanent State workers] is posited by the defendants as their 'rational basis' for the disparity in treatment. Yet there is nothing rational about the assignment of the title. Indeed, it was so irrational that ... when the Governor and legislature learned of it, apparently because the plaintiff brought it to

---

**6.** The parties Local Rule 56(a) Statements do not describe Clark's education or specific position with the State. The parties do agree that Clark was in the leaking underground tank program but cannot state specifically what his job duties were. Thus, without any details regarding Clark's education, or his

tenure and position with the State, the court cannot consider him to be "similarly situated" to the Plaintiff.

**7.** The parties agree that, at all times relevant to this case, the Plaintiff did not hold a college degree.

their attention, they abolished it." (Dkt.# 32.) This argument is, to say the least, muddled. The Plaintiff presents no evidence that the assignment of the title "General Worker" was irrational. Although the parties do not discuss this issue, it is conceivable that the State assigned the "General Worker" title to those people without college educations or prior relevant experience for duties not requiring such education or experience. Thus, the assignment of the title "General Worker," although possibly unpleasant, would have a basis in reason. In addition, the Plaintiff presents no evidence that the State abolished the title because the assignment of the title was somehow irrational or constituted an equal protection violation. It is perfectly conceivable that the State abolished the title because it wished to be more equitable towards General Workers. This has nothing to do with how or why certain people were assigned the "General Worker" title.

Lastly, as the court pointed out above, the Plaintiff argues that it was "irrational" for the him to be called a "General Worker" while others were not. The Plaintiff was not, however, the only General Worker in State service. To follow the Plaintiff's argument to its logical conclusion, it would have been irrational for all General Workers to have that title while others in State service did not. This conclusion destroys the Plaintiff's "class of one" equal protection claim because he cannot allege that he alone was intentionally, and without reason, treated differently from other State workers. Instead, by being called a General Worker, the Plaintiff was treated the same as hundreds of others in State service. Consequently, with regard to the Plaintiff's equal protection claim, the Defendants' motion for summary judgment (dkt.# 29) is **GRANTED**.

## D. FIRST AMENDMENT RETALIATION

The Plaintiff also asserts a First Amendment retaliation claim. As the Second Circuit has held,

a plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

*Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999); *see Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If a plaintiff produces evidence of these three elements, the government may nevertheless escape liability in one of two ways. "One way the government may prevail is by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County of Suffolk* 316 F.3d 368, 382 (2d Cir.2003). "Alternatively, the government may show that plaintiff's speech was likely to disrupt the government's activities, and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." *Id.* at 383–83. (internal quotation marks. omitted.) "The question of whether certain speech enjoys a protected status under the First Amendment is one of law, not fact." *Morris,* 196 F.3d at 110.

Before the Court reaches these issues, however, it must first address a preliminary question—whether the Plaintiff expressed his views as a citizen, or as a public employee pursuant to his official duties. The Supreme Court has held that "when public employees make statements

pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 1961. "When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees." *Id.* This holding is limited "only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints ... that are made outside the duties of employment." *Id.*

 The parties have not specifically addressed this threshold question of whether the Plaintiff made his statements pursuant to his official duties. It is clear to the court, though, that the Plaintiff, when making the statements at issue, was not acting pursuant to his responsibilities as a General Worker. There is no indication in the record that the Plaintiff, as a General Worker, was under any obligation to make the statements he claims were protected speech. Thus, the court finds that *Garcetti* does not extinguish the Plaintiff's First Amendment rights.

 Because *Garcetti* is not dispositive, the court next turns to the three-prong *prima facie* case of (1) public concern, (2) adverse employment action, and (3) causal connection. "Central to this inquiry is whether the speech may 'be fairly characterized as constituting speech on a matter of public concern.'" *Morris,* 196 F.3d at 110 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75

L.Ed.2d 708 (1983)). In general, "speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." *Id.* (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684). Nonetheless, as the Supreme Court has held,

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick,* 461 U.S. at 147, 103 S.Ct. 1684. The court must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen,* 165 F.3d 154, 163–64 (2d Cir.1999). As noted by the Second Circuit, "expressing dissatisfaction with working conditions is not, by itself, speech on matters of public concern." *Tiltti v. Weise,* 155 F.3d 596, 603 (2d Cir.1998); *see Lewis,* 165 F.3d at 164 ("[S]peech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern.").

 The Plaintiff has identified three specific instances in which he claims he participated in "protected speech." The first instance is when he wrote his letter to Senator Prague in May 2004. Having reviewed the Plaintiff's letter to Senator Prague, however, the court concludes that this letter does not constitute protected speech under the First Amendment. The May 2004 letter discusses matters of only personal interest to the Plaintiff, specifically, the Plaintiff's dissatisfaction with his employment, which in turn affected his

personal life. In that letter, the Plaintiff wrote that he felt as though we was being "used by the Department, . . . worked out of [his] class and . . . not justly rewarded for his dedication and service to the State." (Dkt.# 29, Ex. 4.) The Plaintiff then went on to describe his pay, job duties, lack of benefits, personal afflictions (such as the death of family members, which led him to "hide . . . in a bottle"), and medical troubles. (*See id.*) These are the only issues contained in this letter. Thus, the May 2004 letter contains no "broader public purpose," and the Plaintiff was not speaking "as a citizen upon matters of public concern." Instead, he simply was attempting to redress personal grievances. Consequently, the Plaintiff cannot base his First Amendment retaliation claim on the May 2004 letter to Senator Prague.[8]

The second instance of the alleged "protected speech" is when the Plaintiff wrote his letter to Governor Rell on September 22, 2004. The court is unconvinced that this constituted protected speech under the First Amendment. As noted above, the court must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis*, 165 F.3d at 163–64. Unlike the May 2004

letter to Senator Prague, the letter to Governor Rell does mention "the treatment of General Workers" and "the rights of other General Workers." In addition, the letter to Governor Rell discusses the specifications of the "General Worker" position, and the Plaintiff's belief that the DEP "has been ignoring the Connecticut General Statutes and State Personnel Act with regard to the status, classification, and compensation for General Workers for some time." (Dkt.# 29, Ex. 4.) Nevertheless, the letter to Governor Rell, like the letter to Senator Prague, detailed the Plaintiff's dissatisfaction with his own working situation (e.g., his pay rate, his lack of benefits, his lack of a retirement plan, etc.). (*See id.*) The Plaintiff also mentioned that he was "stripped of all job duties" after he sent an email to Fitzpatrick asking why his General Worker experience did not count as work experience when applying for a permanent position with the DEP.[9] (*See id.*) Again, these are complaints about the Plaintiff's working conditions. Thus, in the court's view, this letter, despite containing references to "General Workers," was calculated to redress the Plaintiff's personal grievances.

Even if, however, the court were to assume that the letter to Governor Rell constituted protected speech, the Plaintiff's

8. Even if the court had found that the May 2004 letter to Senator Prague did constitute protected speech, the Plaintiff (assuming that he did suffer some subsequent form of adverse employment action) would face great causal connection problems. The Plaintiff admits that he did not send this letter to anyone other than Senator Prague, and that he cannot state whether anyone at the DEP was aware of his letter when he sent it. The Plaintiff presents no evidence that anyone other Senator Prague read this letter prior to the memorandum dated June 9, 2004, in which the Plaintiff was informed that, in order to conform to the job specifications for General Workers, his job duties would be changed so that he performed only data entry,

filing, phone coverage, photocopying, and cabinet reorganization. Thus, with respect to the May 2004 letter, it is unclear how anyone, let alone the Defendants, could be found liable for the alleged retaliation.

9. Of course, the Plaintiff's statement that he was stripped of all his job duties is not actually true, as he goes on to say in the same paragraph that his job duties were limited to data entry, filing, phone coverage, etc. (*See* dkt. # 29, Ex. 4.) Furthermore, there is no claim that this email to Fitzpatrick, which apparently discussed the Plaintiff's personal situation and not a broader public purpose, is protected speech under the First Amendment.

claim with regard to that letter would still fail. Quite simply, the Plaintiff has presented no evidence demonstrating that he suffered an adverse employment action that resulted from his writing to Governor Rell.[10] The memorandum in which the Plaintiff was informed that, in order to conform to the job specifications for General Workers, his job duties would be changed so that he performed only data entry, filing, phone coverage, photocopying, and cabinet reorganization, was written more than three months before the Plaintiff wrote his letter to Governor Rell. That is, the change in the Plaintiff's duties could not have been retaliation for the Plaintiff complaining to Governor Rell because, when the Plaintiff's duties were changed, the letter had not yet been written or sent. Thus, there is no causal connection between the change in the Plaintiff's duties and the letter.

In addition, the Plaintiff presents little else in the way of specific adverse actions taken against him. Most of the Plaintiff's accusations, as contained in his answers to interrogatories, are too broad and general to support his retaliation claim. In his interrogatory answers, the Plaintiff states: "I was harassed and there were threats against my employment. For example, every time I spoke up, the situation got worse. I wasn't allowed to do anything. I was certainly singled out." (Dkt. # 32, Pl.'s Interrog. Responses ¶ 12.) Such generalized statements are inadequate to support the Plaintiff's retaliation claim, as they do not answer the basis questions of who took these actions or when they were taken.[11]

■ The Plaintiff's reassignment to the Remediation Program on January 25, 2005 is the only specific example of an alleged adverse action taken against Plaintiff after he wrote his letter to Governor Rell. The question then becomes whether this reassignment is sufficient to constitute an adverse action for the purposes of a First Amendment retaliation claim. In the context of Title VII retaliation claims, the Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted). The Second Circuit has held that its standard for First Amendment retaliation claims is equivalent to the standard for Title VII retaliation claims set forth in *White*. *See Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir.2006); *see also Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir.2004) ("In the context of a First Amendment retaliation claim, we have held that [o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.") (internal quotation marks omitted).

This standard "speak[s] of *material* adversity because . . . it is important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.'" *White*, 126 S.Ct. at 2415 (emphasis in origi-

---

10. In support of his opposition memorandum, the Plaintiff has submitted only his answers to the Defendants' interrogatories. He has not submitted any affidavits, deposition testimony, documentation, or other form of evidence to bolster his arguments.

11. The court points out that saying "For example, ... the situation got worse" does not actually provide the court with an "example" of harassment or threats, but rather with a general statement regarding the Plaintiff's situation.

nal) (quoting *Oncale v. Sundowner Off-shore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). In the Second Circuit, "[e]mployment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d 199, 207 (2d Cir.2006) (internal quotation marks omitted). Nevertheless, as seen in *White,* the means by which an employer can retaliate against an employee are "not limited to discriminatory actions that affect the terms and conditions of employment." *White,* 126 S.Ct. at 2412–13.

■ Even under this standard, though, the court finds that the reassignment to the Remediation Program on January 25, 2005 does not constitute an materially adverse action that could support a First Amendment retaliation claim. As noted by the Supreme Court, "[t]o be sure, reassignment of job duties is not automatically actionable." *Id.* at 2417. Here, there was no change in the Plaintiff's job title. Throughout his tenure with the State, he was always a General Worker. Moreover, the Plaintiff's duties immediately before and after his reassignment did not change. In both instances, he was performing similar, if not identical, clerical duties.[12] Thus, although he was assigned to a different department, the Plaintiff was performing the same duties with the same job title at the same rate of pay. Such action would not have discouraged a reasonable worker

from asserting his First Amendment rights.

■ The third instance of the alleged "protected speech" is when the Plaintiff testified on December 1, 2004 at the information hearing before the Labor and Public Employees Committee. The Plaintiff has not provided the court with any evidence (such as a transcript or recording) regarding his testimony at the hearing, thus making it impossible for the court to determine whether his speech touched matters of public concern or his private interest only. Although the Plaintiff mentions that the Defendants failed to submit such evidence, once the Defendants filed their properly supported motion for summary judgment, it was incumbent upon him, as the party opposing summary judgment, to present the evidence supporting his claim. *See* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided by this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, *by affidavits or as otherwise provided in this rule,* must set forth specific facts showing that there is a genuine issue for trial.") (emphasis added). For this reason alone, the Plaintiff's testimony at the information hearing is insufficient to preclude summary judgment here.

Even assuming, however, that the Plaintiff's testimony constituted protected speech under the First Amendment, his claim would still fail for the all same reasons mentioned with regard to the letter sent to Governor Rell, i.e., the lack of evidence demonstrating that materially adverse actions were taken against the Plaintiff because of his speech. Indeed, from

12. As discussed above, the Plaintiff's job duties were altered in June 2004. The court reiterates, though, that these changes occurred before the Plaintiff wrote his letter to Governor Rell. Thus, the alleged reductions in the Plaintiff's responsibilities could not have been in retaliation for his writing the letter to Governor Rell.

what the court can discern, subsequent to the Plaintiff's letter to Governor Rell and testimony at the hearing: (1) all General Workers were granted benefits; (2) after November 24, 2004, all General Workers employed by the DEP were offered a permanent, classified position in State service prior to July 1, 2005, which the Plaintiff declined; and (3) despite this rejection of a permanent, classified position in State service, on June 8, 2005, the Plaintiff was offered the position of Inspection Aide, which he declined. Not only do these actions not constitute adverse actions, they appear to be exactly what the Plaintiff wanted from the start-a permanent position in State service with benefits. As a result, the Plaintiff's First Amendment retaliation claim fails as a matter of law. Consequently, with regard to the Plaintiff's First Amendment retaliation claim, the Defendants' motion for summary judgment **(dkt.# 29)** is **GRANTED.**

### E. QUALIFIED IMMUNITY

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Supreme Court established the analysis for determining whether an officer is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. "[T]he next, sequential step is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

Here, however, the court has found that the Plaintiff has failed to establish that his constitutional rights were violated. "If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover." *Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 761 (2d Cir.2003); *see Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. Therefore, because the first step in the *Saucier* test has not been satisfied, the court need not further discuss the issue of qualified immunity.

### IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment **(dkt.# 29)** is **GRANTED.** Judgment shall enter in favor of the Defendants on all claims in the complaint. The Clerk of the Court shall close this file.